# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Jamie Wallaga

    v.                                         Civil No. 18-cv-687-JL
                                                 Opinion No. 2019 DNH 076
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration


# O R D E R

Jamie Wallaga moves to reverse the decision of the Acting Commissioner of the Social Security Administration ("SSA") to deny her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ"), is affirmed.

## I. Scope of Review

The scope of judicial review of the Acting Commissioner's decision is as follows:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear:  though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not.  Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted).  Rather, "[a court] must uphold the [Acting Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'the drawing of permissible inference from evidentiary facts [is] the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for her, not for the doctors or for the courts.'"  Id. (quoting Rodriguez, 647 F.2d at 222).  Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported

by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

Wallaga was born in 1956. She retired from her position as a customer service representative in November of 2002, but on several occasions between 2012 and 2014 she tried to get work, and she had at least three job interviews. Wallaga was last insured for DIB on December 31, 2011, which is her so-called "date last insured" or "DLI."

In December of 2009, Wallaga saw Anne Marcoux, a nurse practitioner ("NP"), for a follow-up appointment and to have her blood sugar monitored. In her progress note, NP Marcoux indicated that Wallaga had a history of mood disorder, and she listed eight diagnoses, including mood disorder, not otherwise specified. However, she proposed no treatment for Wallaga's mood disorder. Between December of 2009 and November 16, 2011, NP Marcoux wrote six more progress notes after seeing Wallaga. In four of the six, she listed mood disorder as a diagnosis, but in only one note did NP Marcoux propose a treatment for that condition.

Specifically, during an appointment in July of 2011, Wallaga reported a situation with her son that NP Marcoux described this way:

> She has a lot of stress from her son who has
> taken all of her credit cards and maxed them out with
> purchases on e-bay, some are even thousands over the
> limit. She now has over $50,000 debt because of this
> and no credit cards left. She is going to see a
> financial advisor about this. She has tried to get
> him to a psychiatrist but none have returned her
> calls. He stays in his room, sleeping all day and on
> computer at night. Her husband is no help as he works
> second shift and goes to Maine every week end without
> them.

Administrative Transcript (hereinafter "Tr.") 417. In the

section of her progress note devoted to treatment, NP Marcoux

made the following suggestion with respect to Wallaga's mood

disorder:

> [A]dvised [Wallaga] to get counselling for [her] son
> and herself. Advised [her] to get rid of credit cards
> probably too late as they are all maxed out by son.
> Continue to call psych until one returns her call.

Tr. 420. Wallaga appears not to have acted on the advice to get

counselling at any point prior to her DLI. Progress notes from

August and September of 2011 do not list diagnoses of any mental

impairments, and the November 2011 note lists mood disorder as a

diagnosis, but proposes no treatment for it.

After Wallaga's husband served her with divorce papers in

March of 2012, she consulted a lawyer who, among other things,

"told [her] to get a therapist and a psychiatrist." Tr. 76.

In March of 2012, Wallaga presented to Dr. Alain-Marc

Werner complaining that she "[n]eed[ed] medication for anxiety

[because], her father just passed away and her husband [was]

4

divorcing her." Tr. 399. In the history section of his progress note, Dr. Werner reported:

> [L]ast week got divorce papers from husband, next day father died, was then evicted. [H]ere w[ith] youngest sister [J]ill, living with her, massive stress anxiety constant crying pacing talking to self . . . never left alone. [N]o serious suicidal thoughts. [H]ad to meet a divorce lawyer, has hearing next week. [N]o past [history of] mental illness, few glasses wine / day no [change].

Id. Dr. Werner diagnosed Wallaga with anxiety and prescribed lorazepam.[1]

In April of 2012, Wallaga began treating with Dr. Debra Little, a psychiatrist. In her clinical evaluation, Dr. Little described Wallaga's presenting problem: "[H]usband abruptly announced intent to divorce while [Wallaga's] father was dying in hospice. Patient endorses anxiety and depression." Tr. 749. Under the heading "Previous Psych/CD Treatment H[istory]," Dr. Little indicated that Wallaga had had no such treatment. See id. In her mental-status assessment, Dr. Little found that (1) Wallaga's general appearance/facial expression and speech were within normal limits; (2) her attention span, insight, and judgment were good; (3) she had no hallucinations or delusions; (4) her mood was anxious and depressed; and (5) her affect was

---

[1] Lorazepam is "a benzodiazepine with anxiolytic and sedative effects administered orally in the treatment of anxiety disorders and [for] short-term relief of anxiety symptoms . . . ." Dorland's Illustrated Medical Dictionary 1074 (32nd ed. 2012).

restricted.  Dr. Little concluded by: (1) making a diagnosis of
adjustment disorder with depressed mood; (2) recommending
individual therapy and psychopharmacology; and (3) prescribing
Remeron and Ativan.[2]

Also in April of 2012, Wallaga began seeing Shawn Teal, a
mental health counsellor, for weekly cognitive behavioral
therapy sessions.  Mr. Teal noted that Wallaga had a depressed
mood, and that her chief complaint was anxiety.

In July of 2013, Wallaga was taken to a hospital emergency
room by her sister and sister-in-law who were concerned by
suicidal comments she had made after a night of heavy drinking.
She was discharged later that day with diagnoses of depression
and alcohol abuse and instructions to contact her psychiatrist
and her counsellor.

Wallaga applied for DIB in September of 2014 claiming that
she had been disabled since December 31, 2011, which was also
her DLI.  According to Wallaga, her disability resulted from
back pain, neck pain, depression, anxiety, and vertigo.

As a part its evaluation of Wallaga's application, the SSA
had Dr. Nicholas Kalfas, a psychologist and state-agency
consultant, review her medical records.  After doing so, Dr.

---

[2] Remeron is a "trademark for a preparation of mirtazapine."
Dorland's, supra note 1, at 1623.  Mirtazapine is "an
antidepressant compound."  Id. at 1169.  Ativan is a "trademark
for preparations of lorazepam."  Id. at 173.

Kalfas had this to say: "Although there is medical evidence to suggest that claimant has anxiety and/or depression, there is no [diagnosis of a medically determinable impairment] from [an acceptable medical source] and insufficient evidence to fully assess functioning from AOD [the date on which Wallaga alleges she became disabled] to DLI," Tr. 97. The SSA denied Wallaga's application and explained its decision this way:

> In order to be entitled [to] benefits your condition must be found to be severe prior to 12/31/2011. The evidence [on] file is not sufficient to fully evaluate your claim and the evidence needed cannot be obtained. We have determined your condition was not disabling on any date through 12/31/2011, when you were last insured for disability benefits. In deciding this, we considered the medical records, your statements, and how your condition affected your ability to work.

Tr. 98.

After the SSA turned down Wallaga's application, she requested a hearing before the ALJ. Before her hearing, Wallaga obtained a Mental Impairment Questionnaire from Dr. Little, who completed it in June of 2016, and a similar questionnaire from Mr. Teal, who completed it in July of 2016.

In her questionnaire, Dr. Little listed diagnoses of alcohol abuse and recurrent severe major depressive disorder. In addition, she opined that Wallaga's depressive disorder was severe enough to qualify as a "listed impairment," i.e., a condition on the SSA's list of impairments that are per se disabling. When asked to "[d]escribe the clinical findings

7

including results of mental status examination that
demonstrate[d] the severity of [Wallaga's] mental impairment and
symptoms," Tr. 1094 (emphasis in the original), Dr. Little
wrote: "clinical anxiety resistant to [treatment]," Tr. 1094.
Finally, in response to a question asking whether "the
impairments [she] assessed . . . existed since 12/31/2011," Tr.
1099, Dr. Little checked the box for "yes," id.  In September of
2016, Dr. Little penned the following addendum to her
questionnaire:

> I am in agreement w/previous summary.  However patient
> has manifested worsened anxiety & guilt due to the
> physical assault from her son.

Tr. 1153.[3]  Mr. Teal filled out the same questionnaire that Dr.
Little filled out, but because his responses do not figure into
the analysis that follows, for reasons that are explained below,
there is no need to describe them here.

After Wallaga's hearing, which was held in October of 2016,
the ALJ submitted two requests for evidence to Dr. Dawn
Gullette-Crosson, a psychologist who, at the time, was a state-
agency consultant.  Specifically, he sent Dr. Gullette-Crosson:
(1) a Medical Source Statement of Ability to do Work-Related
Activities (Mental), which asked about Wallaga's then-current

---

[3] The physical assault to which Dr. Little referred took
place in June of 2016.  See Tr. 832, 1143.

level of functioning; and (2) a set of medical interrogatories. Dr. Gullette-Crosson did not examine Wallaga, but rather, reviewed her medical records, including records pre-dating her DLI, see Tr. 15, and the questionnaires that Dr. Little and Mr. Teal had filled out.

In her interrogatories, Dr. Gullette-Crosson began by checking a box indicating an affirmative response to a question asking whether there was "sufficient objective medical and other evidence to allow [her] to form opinions about the nature and severity of [Wallaga's] impairment(s) during the relevant time period (both before and after [Wallaga's] alleged onset date of December 31, 2011)," Tr. 1191. In her narrative response to that same question, Dr. Gullette-Crosson acknowledged: (1) medical evidence generated by Wallaga's July 2013 emergency room visit; (2) Dr. Little's June 2016 diagnosis; and (3) Mr. Teal's July 2016 diagnosis. Then, in response to a question asking about Wallaga's limitations in four areas of functioning, through December 31, 2011, Dr. Gullette-Crosson opined that Wallaga's limitations were, at most, moderate.[4] She elaborated: "No evidence of mental health impairment prior to 2013. 2013 on

---

[4] The question Dr. Gullette-Crosson answered gave her five choices for quantifying claimant's limitations, none, mild, moderate, marked, and extreme, and explained that "[t]he last point on each scale [i.e., "extreme"] represents a degree of limitation that is incompatible with the ability to do any gainful activity." Tr. 1193.

Claimant reportedly had [and] was diagnosed with anxiety and depression." Tr. 1193 (citations to the record omitted). Next, Dr. Gullette-Crosson opined that before December 31, 2011, Wallaga did not have any mental impairment that met or medically equaled the severity of any listed impairment. When asked what Wallaga was still able to do in a work setting before her DLI, Dr. Gullette-Crosson replied:

> No evidence of mental health impairment prior to 2013. Claimant listed no work history. She may be successful in jobs with limited interaction with the public.

Tr. 1196.

After the ALJ received the evidence he solicited from Dr. Gullette-Crosson, he informed Wallaga that she could submit written questions to Dr. Gullette-Crosson, and further explained:

> You may also request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law. If you request a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision. In addition, you may request an opportunity to question witnesses, including the author(s) of the new evidence. I will grant a request to question a witness if I determine that questioning the witness is needed to inquire fully into the issues.

Tr. 328. Wallaga requested a supplemental hearing and a chance to question Dr. Gullette-Crosson, but she never received a supplemental hearing.

Nearly a year after the hearing Wallaga did receive, Dr. Little wrote a letter in which she indicated that she had been treating Wallaga for approximately four years and that Wallaga had been "referred to [her] to manage symptoms of anxiety and depression due to divorce proceedings." Tr. 1307. She went on to describe a series of events in Wallaga's life that took place while Wallaga was treating with her.

In December of 2017, the ALJ issued his decision. As for the supplemental hearing that Wallaga had requested, the ALJ explained:

> After [Dr. Gullette-Crosson's] response was proffered to the claimant and counsel, counsel requested a supplemental hearing in order to question Dr. Crosson. Dr. Crosson, however, no longer contracts with the Agency to provide medical consultant services, and is therefore not available to testify in a supplemental hearing. Because she is not available, I did not hold a supplemental hearing. I am, however, considering her response to the interrogatories.

Tr. 15.

Substantively, the ALJ found that prior to her DLI, Wallaga had: (1) one medically determinable physical impairment; (2) no medically determinable mental impairments; and (3) no severe physical or mental impairments. This is the ALJ's explanation for his finding that Wallaga did not have a medically determinable mental impairment prior to her DLI:

> While the claimant received some routine care in the period prior to the date last insured, the record fails to contain any valid diagnosis by an acceptable

11

medical source supporting a mental impairment prior to December 31, 2011. Of note, the claimant was formally diagnosed with a mental impairment after the date last insured, when she began seeing mental health providers in spring 2012. The claimant's reported symptoms worsened in March 2012, when her father died and her husband unexpectedly filed for divorce, took out a restraining order on her, and had her evicted from her home without money or resources. . . . The only issues in the period prior to the date last insured related to financial concerns and issues with her son, which were more longitudinal problems that had been occurring for a number of years. Given the acute stressors that caused the claimant's deterioration in March 2012, and the longitudinal course of symptoms previously, the claimant's somewhat decreased functioning in 2012 does not reasonably relate back prior to the date last insured.

Tr. 19. Based upon his finding that claimant had no severe medically determinable impairments prior to her DLI, the ALJ determined that Wallaga "was not under a disability, as defined in the Social Security Act, at any time from December 31, 2011, the alleged onset date, through December 31, 2011, the date last insured." Tr. 24.

### III. Discussion

A. <u>The Legal Framework</u>

To be eligible for DIB, a person must: (1) be insured for that benefit; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. § 423(a)(1)(A)-(D). The only question in this case is whether the ALJ correctly determined that Wallaga was not under a disability from December 31, 2011, through December 31, 2011.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step sequential evaluation process.  See 20 C.F.R. § 404.1520.

> The steps are:  1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

At the first four steps in the sequential evaluation process, the claimant bears both the burden of production and the burden of proof.  See Purdy, 887 F.3d at 9 (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must prove she is disabled by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[5]  Finally,

> [i]n assessing a disability claim, the [Acting Commissioner] considers objective and subjective factors, including:  (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the [claimant] or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

B.  Wallaga's Claims

Wallaga claims that the ALJ erred by:  (1) failing to give her a supplemental hearing before relying on the evidence he solicited from Dr. Gullette-Crosson; and (2) giving great weight to the opinions of Drs. Kalfas and Gullette-Crosson while giving little weight to the opinions of Dr. Little and Mr. Teal when determining that she did not have a severe medically determinable mental impairment prior to her DLI.  Neither claim entitles Wallaga to a remand.

---

[5] At step 5, the burden of proof shifts to the Acting Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting Commissioner's step-5 determination is not at issue here, so there is no need to describe the mechanics of step 5.

1.  Supplemental Hearing

Wallaga frames her supplemental-hearing claim in the
following way:

> The material discrepancy between Dr. Crosson's
> opinion regarding the dates when Ms. Wallaga was first
> diagnosed with mental impairments and the evidence of
> record regarding that issue could have been more fully
> explored during the supplemental hearing requested by
> Ms. Wallaga, whether or not Dr. Crosson was available
> to testify, potentially resulting in Dr. Crosson's
> opinion being given less weight in the ALJ's decision
> or in the ALJ obtaining opinion evidence from another
> reviewing consultant who would have been available to
> testify at a supplemental hearing if needed.

Cl.'s Mem. of Law (doc. no. 8-1) 5-6.

The SSA's Hearings, Appeals & Litigation Law Manual
(HALLEX) provides that when, as here, an "ALJ offer[s] the
opportunity for a supplemental hearing with proffered evidence
and the claimant requests a supplemental hearing, the ALJ must
grant the request unless the ALJ has already decided to issue a
fully favorable decision." HALLEX I-2-7-30(C)(1), 1993 WL
643048 (updated 4/1/16).  However, as the Acting Commissioner
correctly points out, the Court of Appeals for this circuit has
stated that the HALLEX is not binding on the SSA.  See
Justiniano v. Berryhill, 876 F.3d 14, 29 (1st Cir. 2017) (citing
Schweiker v. Hansen, 450 U.S. 785, 789 (1981) ("[T]he Claims
Manual is not a regulation.  It has no legal force, and it does

not bind the SSA.")).[6]  Therefore, an ALJ's violation of the HALLEX, standing alone, is not a reversible error in the First Circuit.

According to the Acting Commissioner, Justiniano sounds the death knell for Wallaga's first claim.  The Acting Commissioner is probably correct, but there is one legal wrinkle that counsels in favor of further consideration of Wallaga's first claim.  While claimant does not raise this issue, there is authority for the proposition that a violation of HALLEX I-2-7-30(C) can also run afoul of a claimant's constitutional right to due process.  See, e.g., Montgomery v. Berryhill, No. 4:17 CV 1207 CDP, 2018 WL 3971949, at *3 (E.D. Mo. Aug. 20, 2018) (ruling that HALLEX violation provided no basis for remand, but due-process violation, based upon same conduct, did require remand); see also Hiers v. Berryhill, No. 6:17-cv-189-Orl-DNF, 2018 WL 4520354, at *3-4 (M.D. Fla. Sept. 21, 2018) (applying due-process analysis to claim that ALJ violated HALLEX by failing to deliver interrogatories to medical expert or to allow cross-examination at supplemental hearing).  That said, "[w]hile disability claimants have a procedural due process right to a

_____

[6] The court notes that the HALLEX "consists of two volumes," HALLEX I-1-0-2(A), 2005 WL 1863822, at *1 (updated 6/21/05), while the "Claims Manual" to which the Supreme Court referred in Hansen was "a 13-volume handbook," 450 U.S. at 789.  Thus, it is not clear that the manual in Hansen was the HALLEX.

full and fair hearing, their right to cross-examine witnesses or those who submit reports is not absolute given the non-adversarial nature of the social security process." Montgomery, 2018 WL 3971949, at *4 (citing Passmore v. Astrue, 533 F.3d 658, 663-64 (8th Cir. 2008)); see also Hiers, 2018 WL 4520354, at *4 ("[C]ross-examination [is] not required in every case. 'Due process is flexible and calls for such procedural protections as the particular situation demands.'") (quoting Mathews v. Eldridge, 424 U.S. 319, 334 (1976)).

For either a HALLEX violation (in jurisdictions that recognize the HALLEX as imposing legally enforceable obligations on the SSA) or a due-process violation to be a reversible error, a claimant must show prejudice. See Dunham v. Colvin, No. 1:16-cv-00033-DBH, 2016 WL 7048691, at *6 (D. Me. Dec. 5, 2016) ("assuming that the plaintiff had shown a violation of the HALLEX or of due process, he fails to make the showing of prejudice necessary to warrant reversal and remand") (citing Dawes v. Astrue, No. 1:11-cv-272-DBH, 2012 WL 1098449, at *3-4 (D. Me. Mar. 20, 2012) (HALLEX); Newcomb v. Colvin, No. 2:15-cv-463-DBH, 2016 WL 3962843, at *3 (D. Me. July 22, 2016) (due process)); see also Smith v. Comm'r of Soc. Sec., Civ. Action No. 15-11172, 2016 WL 4253965, at *7 (E.D. Mich. July 15, 2016) ("it is not necessary to consider the interplay between HALLEX and the due process clause in this case, because regardless of

whether the error flowed from the SSA regulations or the constitution, it was harmless"). Here, claimant has not shown that she was prejudiced by the ALJ's failure to give her a supplemental hearing at which she could cross examine Dr. Gullette-Crosson.

To show prejudice, claimant must show that a cross examination of Dr. Gullette-Crosson would have made a difference to the ALJ's decision. See Dunham, 2016 WL 7048691, at *6 (citing Bowman v. Colvin, No. 1:12-CV-246-GZS, 2013 WL 1907454, at *5 (D. Me. Mar. 31, 2013) (explaining that a claimant "must show that, had the ALJ done his duty, she could and would have adduced evidence that might have altered the result")); see also Saulsberry v. Comm'r of Soc. Sec., No. 3:16-CV-156-RP, 2017 WL 710963, at *3 (N.D. Miss. Feb. 22, 2017) ("Prejudice is established by showing that additional evidence could have been produced that 'might have led to a different decision.'") (quoting Wirick v. Colvin, No. 3:14CV370 CWR-LRA, 2015 WL 4726490, at *2 (S.D. Miss. July 28, 2015); Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000)). However, "[i]f there is 'no realistic possibility that, absent the error' the outcome would have been different, an error is considered harmless." Saulsberry, 2017 WL 710963, at *3 (quoting Wirick, 2015 WL 4726490, at *2).

Wallaga claims that cross examination might have caused the ALJ to give less weight to "Dr. Crosson's opinion regarding the dates when Ms. Wallaga was first diagnosed with mental impairments." Cl.'s Mem. of Law (doc. no. 8-1) 5. But even assuming that what Dr. Gullette-Crosson said about the date of Wallaga's diagnosis was a medical opinion in the first place, which it was not, see 20 C.F.R. § 404.1527(a)(1) (defining "[m]edical opinions" as "statements . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s)"), and assuming that Dr. Gullette-Crosson said that Wallaga was not diagnosed with a mental impairment until 2013, which is a bit of a stretch, the ALJ gave no weight to any such "opinion."[7] To the contrary, he expressly found that claimant received formal diagnoses of mental impairments in the spring of 2012, and further observed, accurately, that the record includes no pre-DLI diagnosis of a mental impairment from an acceptable medical source. So, as a logical matter, there is nothing that Wallaga could have gotten from Dr. Gullette-Crosson on cross examination

---

[7] Rather than crediting an "opinion" by Dr. Gullette-Crosson on the date of claimant's diagnoses, the ALJ actually "afford[ed] great weight to [Dr. Gullette-Crosson's] opinion . . . that claimant had no medically determinable mental impairment in the period prior to the date last insured." Tr. 20. However, as the court explains more fully in the section that follows, medical opinions have no bearing on the determination of whether an impairment is medically determinable. See 20 C.F.R. § 404.1521.

regarding the date of her first diagnosis that could have altered the ALJ's factual findings on that issue, and Wallaga does not even attempt to explain how cross examination might have supported her claim. Thus, she has not shown that she was prejudiced by not having the opportunity to cross examine Dr. Gullette-Crosson.

The lack of prejudice is further underscored by the fact that the ALJ himself acknowledged the "material discrepancy," Cl.'s Mem. of Law (doc. no. 8-1) 5, that claimant says she would have explored on cross examination, and he essentially resolved it in her favor. Specifically, after noting Dr. Gullette-Crosson's statement "that there was no evidence of any impairment prior to 2013," Tr. 20, the ALJ went on to state that he had "fully considered counsel's argument that the claimant's mental health treatment began in spring 2012, with diagnoses provided about that time," id., and, indeed, the ALJ found that "the claimant was formally diagnosed with a mental impairment . . . when she began seeing mental health providers in spring 2012," Tr. 19. Because the ALJ's decision gave full consideration to any argument that might have been supported by any evidence that might have been generated by a cross examination of Dr. Gullette-Crosson, the ALJ's failure to give claimant a supplemental hearing was, at worst, a harmless error that provides no basis for a remand.

2. <u>Step Two</u>

Wallaga also claims that "[t]he ALJ erroneously evaluated the opinion evidence of record in determining that [she] had no severe impairments prior to her DLI."  Cl.'s Mem. of Law (doc. no. 8-1) 6.  While claimant frames her second argument in terms of the ALJ's evaluation of the medical opinion evidence, it is more properly analyzed as a challenge to the ALJ's step-2 finding.

At step 2 of the SSA's sequential evaluation process, the SSA "considers the medical severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1520(a)(4), and

> [i]f [a claimant] do[es] not have a severe medically
> determinable physical or mental impairment that meets
> the duration requirement in § 404.1509, or a
> combination of impairments that is severe and meets
> the duration requirement, [the SSA] will find that
> [the claimant is] not disabled.

Id.

A "medically determinable impairment," in turn, "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521.[8]  However, the existence

---

[8] "<u>Objective medical evidence</u> means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f) (emphasis in the original).  In this context, "signs" are

> one or more anatomical, physiological, or
> psychological abnormalities that can be observed,
> apart from [a claimant's] statements (symptoms).
> Signs must be shown by medically acceptable clinical
> diagnostic techniques.  Psychiatric signs are

of a medically determinable impairment cannot be established by a claimant's "statement of symptoms, a diagnosis, or a medical opinion." Id. It is only after establishing that a claimant has a medically determinable impairment that the SSA will go on to determine whether that impairment is severe.[9] See id.

Here, the ALJ determined that claimant did not have a medically determinable mental impairment prior to her DLI. That determination is supported by substantial evidence.

The only evidence in the record concerning claimant's mental health that predates her DLI is contained in the progress notes from NP Marcoux. But, the ALJ points out that NP Marcoux is not an acceptable medical source. Claimant does not disagree, and there is no evidence to suggest that NP Marcoux meets the regulatory definition of an acceptable medical source, see 20 C.F.R. § 404.1520(a). Thus, even if NP Marcoux's progress notes contained objective medical evidence of a mental

---

medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated.

§ 404.1502(g) (emphasis in the original). Finally, "[s]ymptoms means [a claimant's] own description of [his] physical or mental impairment." § 404.1502(i) (emphasis in the original).

[9] An impairment is severe when it "significantly limit[s] [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a).

impairment, which is far from clear, no such evidence could establish the existence of a medically determinable impairment, because NP Marcoux is not an acceptable medical source.  See 20 C.F.R. § 404.1521.  Consequently, Wallaga's ability to establish a medically determinable mental impairment rests on the medical evidence generated by Dr. Little.[10]

As noted, Wallaga did not start treating with Dr. Little until after her DLI, and, according to Dr. Little's initial evaluation, Wallaga's presenting problem was a set of events that took place after her DLI, i.e., her pending divorce and her father's recent death.  Moreover, neither Dr. Little's initial evaluation nor any of her treatment notes appear to present any retrospective assessment of Wallaga's mental condition, and in her evaluation, Dr. Little acknowledged that Wallaga had received no previous psychological treatment.

For her claim that she had a medically determinable mental impairment prior to her DLI, Wallaga relies on the June 2016 Mental Impairment Questionnaire that Dr. Little filled out about four and a half years after her DLI.  While Dr. Little gave two diagnoses and listed various symptoms reported by claimant, neither a diagnosis nor a claimant's statement of symptoms is

---

[10] While Wallaga also received counselling from Mr. Teal, and her counselling sessions generated many treatment notes, she does not argue that Mr. Teal is an acceptable medical source, and there appears to be no basis for arguing that he is.

sufficient to establish a medically determinable impairment.
See 20 C.F.R. § 404.1521.  Rather, a medically determinable
impairment "must be established by objective medical evidence."
Id.  However, the only "clinical finding" that Dr. Little
reported on her questionnaire, "clinical anxiety resistant to
t[reatment]," Tr. 1094, is a mere diagnosis, not a piece of
objective medical evidence, see 20 C.F.R. § 404.1502(f).  Thus,
even though that "clinical finding" came from an acceptable
medical source, it is insufficient to establish a medically
determinable mental impairment prior to claimant's DLI.  See 20
C.F.R. § 404.1521.

     In short, neither Dr. Little's treatment notes nor her
Mental Impairment Questionnaire include any objective medical
evidence to support a finding that Wallaga had a medically
determinable mental impairment prior to her DLI.  For that
reason, the circumstances of this case have much in common with
those in Bullard v. Commissioner, SSA, 752 F. App'x 753 (11th
Cir. 2018), in which the Court of Appeals affirmed the District
Court's ruling that the claimant did not have a medically
determinable impairment.  As the court explained in Bullard:

     [S]ubstantial evidence supports the ALJ's finding that
     Bullard did not have a medically determinable
     impairment between May 1, 1998 — Bullard's alleged
     onset date of disability — and June 30, 1998, the date
     he was last insured.  First, Bullard did not submit
     any medical records, evidence, or testing that
     indicated a disability during the relevant time

period. . . . Finally, although Bullard presented
medical evidence of impairment after June 30, 1998,
there was no reasonable basis to conclude that this
evidence related back to his previous disability
claim. See Demandre v. Califano, 591 F.2d 1088, 1090
(5th Cir. 1979) ("If a claimant becomes disabled after
he has lost insured status, his claim must be denied
despite his disability.") (emphasis in original);
Jones v. Colvin, No. 3:15-v-208-J-34MCR, 2015 WL
9694507, at *6 (M.D. Fla. Dec. 15, 2015) ("[O]pinions
rendered after Plaintiff's date of last insured are of
little value to the ALJ's disability determination. .
. .").

752 F. App'x at 755 (footnotes omitted).

In sum, the ALJ's determination that Wallaga did not have a
medically determinable mental impairment prior to her DLI is
supported by substantial evidence. Accordingly, that
determination provides no basis for a remand.

### 3. Medical Opinions

The court concludes by noting that despite the attention
paid by both sides to the ALJ's evaluation of the medical
opinions in this case, there is no need for the court to reach
that issue. That is because substantial evidence supports the
ALJ's step-2 determination that claimant had no medically
determinable mental impairment prior to her DLI, and medical
opinion evidence is immaterial to deciding the question of
whether an impairment is medically determinable, see 20 C.F.R. §
404.1521. Since there is no need to do so, the court declines
to assess the ALJ's evaluation of the medical opinion evidence
in this case.

## IV. Conclusion

The ALJ has committed neither a legal nor a factual error in evaluating Wallaga's claim, see Manso-Pizarro, 76 F.3d at 16. Accordingly, claimant's motion for an order reversing the Acting Commissioner's decision[11] is denied, and the Acting Commissioner's motion for an order affirming her decision[12] is granted. The clerk of the court shall enter judgment in favor of the Acting Commissioner and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  May 6, 2019

cc:  D. Lance Tillinghast, Esq.
     Hugh Dan Rappaport, Esq.

---

[11] Document no. 8.

[12] Document no. 9.